# IN THE COURT OF APPEALS OF IOWA

No. 14-0431
Filed August 27, 2014

**IN THE INTEREST OF A.D. and J.D.,**
    **Minor Children,**

**LUCY VALAINIS, Guardian Ad Litem,**
    Appellant,

**STATE OF IOWA,**
    Appellant.
_____

    Appeal from the Iowa District Court for Scott County, Christine Dalton, District Associate Judge.


    The State and guardian ad litem separately appeal from the juvenile court order dismissing the State's petition to terminate parental rights. **REVERSED.**


    Thomas J. Miller, Attorney General, Kathrine S. Miller-Todd, Assistant Attorney General, Michael J. Walton, County Attorney, and Julie A. Walton, Assistant County Attorney, for appellant-State of Iowa.

    Lucy H. Valainis, Davenport, appellant Guardian Ad Litem.

    Carrie E. Coyle of Carrie E. Coyle, P.C., Davenport, for appellee-mother.

    Jean Capdevila, Davenport, for appellee-father.


    Considered by Danilson, C.J., and Vogel and Bower, JJ.

**BOWER, J.**

The State and guardian ad litem separately appeal from the juvenile court order dismissing the State's petition to terminate a mother's and a father's parental rights. The juvenile court concluded the State failed to present clear and convincing evidence to support termination of the mother's parental rights under any of the grounds alleged in the petition. It also concluded termination of the mother's rights was not in the children's best interests. Although the court found the State had proved the grounds for terminating the father's parental rights, it declined to terminate as the children were in the mother's care.

After a de novo review of the record, we find clear and convincing evidence supports termination. We reverse the juvenile court's ruling and order termination of both the mother's and the father's parental rights.

**I. BACKGROUND FACTS AND PROCEEDINGS.**

This appeal involves two children, born in 2008 and 2009. The family first came to the attention of the Department of Human Services (DHS) in September 2011 due to concerns regarding substance abuse by both parents, domestic violence perpetrated by the father against the mother, and the children's lack of supervision. The mother consented to the children's removal and placement with their paternal grandmother. They were returned to the mother's care approximately one month later with a safety plan in place.

The children were again removed in February 2012 after the DHS received reports that the mother was unconscious while the children were alone in her care on two separate occasions. At the time, the children, who were only

two and three years old, sought the assistance of a neighbor after they were unable to awaken their mother. This time, the children were placed with the paternal grandmother until June 2012, when they were placed in foster care.

The children were adjudicated in need of assistance (CINA) pursuant to Iowa Code sections 232.2(6)(b), (c)(2), and (n) (2011). At the time of the adjudication, the father was incarcerated. He was discharged briefly in late 2013 before being arrested for a parole violation in December 2013. His anticipated date of release is not until 2016.

On July 31, 2012, the mother entered the Center for Alcohol and Drug Services "detox program." She also began a twenty-one-day in-patient program at Country Oaks. In August 2012, she also entered the Family Wellness Court (FWC) program.

The mother, who is diagnosed with anxiety disorder and borderline personality disorder, stopped taking her prescription mental health medications. While she claimed she did so because the FWC did not want her to take Xanax, the FWC team advised her to request medications that are considered safe for recovering addicts. The mother did not feel she needed to be engaged in formal mental health services.

Although the mother was meeting all the requirements of her plan, there were concerns. Providers felt that rather than benefiting from the services provided, the mother was using the time to socialize. At the end of September 2012, she stayed with a substance-using friend and returned intoxicated the following day.

In November 2012, the mother moved into the maternal grandmother's home. Although the mother had previously reported the maternal grandmother was an alcoholic, she denied this after moving into the home, claiming she had been drunk when she said that. The mother's sister, who also has addiction issues, lived in the home as well.

The mother missed a drug screen in April 2013 and again in July 2013. During this time, she was in a relationship with a man who also struggled with addiction.[1] In order to show her commitment to recovery, the mother was to attend thirty AA meetings in thirty days and to write a summary after each meeting, but failed to do so. In a report to the juvenile court, the DHS worker noted, as the mother progressed in her case and her schedule filled up, "recovery seems to be the first thing she is letting go."

In August 2013, the mother obtained an apartment, though there were concerns about her ability to afford it long term without assistance. The following month, it was discovered that she obtained the apartment along with M.L., with whom she had been in a relationship she actively hid from the DHS for approximately four months. M.L. actively used alcohol and has been twice charged with OWI, most recently in 2012.

The mother twice tested positive for alcohol use in September 2013. Although she initially denied using alcohol, she later admitted to drinking on three occasions that month. When pressed further, the mother admitted she had been using alcohol throughout her enrollment in FWC; she used alcohol immediately

---

[1] The relationship ended when the man went to jail on a third OWI charge and a domestic-violence incident.

following a drug screen, knowing the alcohol use would not show in the next drug screen. She reportedly denied having a problem with alcohol and stated she had lied about her belief she was an alcoholic.

Although the mother had reported ending her relationship with M.L., he was arrested for domestic assault causing injury against the mother in November 2013. At that time, it was discovered that M.L. was on the lease to the mother's apartment and the two had been living together. The mother admitted M.L. had been physically abusive toward her for several months. During that time, she had allowed M.L. to be around the children.

On December 11, 2013, the State filed a petition seeking to terminate both the mother's and the father's parental rights pursuant to Iowa Code sections 2323.116(1)(a), (b), (d), (e), (f), (i), (k), and (*l*) (2013). The children were placed in a pre-adoptive foster care on December 31, 2013. The termination hearing was held on February 4, 2014.

On February 26, 2014, the juvenile court entered its order dismissing the termination petition. It found the State failed to present clear and convincing evidence the grounds for terminating the mother's parental rights exist. While the juvenile court found the State proved the grounds for terminating the father's parental rights under sections 232.116(1)(d), (f), and (*l*), it declined to terminate his rights because the mother has custody of the child. *See* Iowa Code § 232.116(3)(a). Both the State and guardian ad litem appeal this order.

**II. SCOPE AND STANDARD OF REVIEW.**

We review termination proceedings de novo. *In re A.B.*, 815 N.W.2d 764, 773 (Iowa 2012). We are not bound by the juvenile court's fact-findings, although we do give them weight—especially when assessing witness credibility. *Id.*

Termination of parental rights may occur only if the requirements for termination under section 232.116 are supported by clear and convincing evidence. *In re D.S.*, 806 N.W.2d 458, 465 (Iowa Ct. App. 2011). Evidence is "clear and convincing" where there are no serious or substantial doubts as to the correctness of conclusions of law drawn from the evidence. *Id.*

**III. ANALYSIS.**

Termination of parental rights under Iowa Code chapter 232 follows a three-step analysis. *See In re P.L.*, 778 N.W.2d 33, 39 (Iowa 2010). The first step is to determine whether a ground for termination under section 232.116(1) is established. *Id.* If so, the court then applies the best-interest framework set out in section 232.116(2) to determine if the grounds for termination should result in a termination of parental rights. *Id.* If the statutory best-interest framework supports termination of parental rights, the court must finally consider if any of the factors set out in section 232.116(3) weigh against termination of parental rights. *Id.*

The State petitioned the court to terminate the mother's parental rights on eight grounds. If the elements of any one found are proved by clear and convincing evidence, the first element part of the analysis is met. *See In re R.R.K.*, 544 N.W.2d 274, 276 (Iowa Ct. App. 1995) (noting we need only find

grounds to terminate under one ground to affirm an order terminating parental rights).

In order to terminate under section 232.116(1)(f), the State must prove the following:

> (1) The child is four years of age or older.
> (2) The child has been adjudicated a child in need of assistance pursuant to section 232.96.
> (3) The child has been removed from the physical custody of the child's parents for at least twelve of the last eighteen months, or for the last twelve consecutive months and any trial period at home has been less than thirty days.
> (4) There is clear and convincing evidence that at the present time the child cannot be returned to the custody of the child's parents as provided in section 232.102.

There is no dispute the circumstances set forth in the first three subparagraphs existed at the time of the court's order. The only question is whether the children can be returned to the mother's care.

The juvenile court found the State failed to prove clear and convincing evidence to terminate the mother's parental rights under section 232.116(1)(f), stating as follows:

> The circumstances that lead to the abuse/neglect do not exist at the present time. There have been no known incidents of intoxication that would lead to neglect had the children been present since October 2012. The mother has received services to correct those circumstances, while she relapsed in the Summer of 2013 and again approximately 5 months ago, she has demonstrated complete sobriety since that time. Unlike the father, her prognosis is good. The children can be returned to her custody *within a reasonable period of time*.[2]

(Emphasis added.)

---

[2] We note that the court did not find the children could be returned to the mother's care at that time.

Our review of the record convinces us the children cannot be returned to the mother. At the time of the termination hearing, the mother's visits were being fully supervised. Although she had progressed to unsupervised visits by the summer of 2013, they were changed to partly-supervised after the mother's alcohol use was discovered in September 2013 and to fully-supervised following the November 2013 domestic violence incident. Even assuming all went well, it would still take several months to transition the children back into the mother's custody. The State proved the grounds for termination under section 232.116(1)(f).

We then turn to the best-interests analysis. In so doing, we "give primary consideration to the child's safety, to the best placement for furthering the long-term nurturing and growth of the child, and to the physical, mental, and emotional condition and needs of the child." Iowa Code § 232.116(2). We consider what the future is likely to hold for the children if returned to the mother's care. *See In re J.K.*, 495 N.W.2d 108, 110 (Iowa 1993). The best evidence for this determination is the mother's past performance, because that may indicate the quality of future care she is capable of giving. *See id.*

Weighing against termination is the evidence of the progress the mother has made during the two years since the children's second removal. No provider testified they had concerns regarding the mother's parenting skills at the time of termination. Laura Tackett, the therapist who provided the mother with Parent Child Interaction Therapy, testified that controlling the children's behavior and disciplining them were skills the mother has "grown the most through therapy"

and she believed the mother had showed evidence during the sessions that she was "able to meet their behavior challenges with appropriate responses." Unfortunately, this is not enough.

There are ongoing concerns regarding the mother's ability to provide a safe home for the children. While on the surface the mother has complied with the expectations placed upon her with regard to attendance and participation in services, concerns persist regarding whether she has made the necessary changes to allow the children to be safely returned to the mother's care. It appears the mother had been progressing with her substance abuse issues until the spring and summer of 2013, when she missed two drug screens. Out of concern for her commitment to sobriety, the mother was assigned the task of attending thirty AA meetings in thirty days and to summarize each. She failed to do so. In September 2013, she tested positive for alcohol use, but denied it. She persisted in lying about her alcohol use, going as far as paying for a second test to confirm the findings before admitting she had used alcohol after testing positive a second time. The mother testified the first incident occurred when she was offered to try new drinks that were on the menu at the restaurant at which she worked. Despite having been in a recovery program for over one year, the mother decided to try them. More troubling is the mother's testimony regarding the second incident of alcohol use that month, when she testified she bought alcohol on the way home from work because, "I was just stressed out. I was irritated."

The juvenile court noted that the mother had been sober for five months at the time it entered its order dismissing the termination petition. Of course, it had also been believed the mother had maintained sobriety for nearly one year at the time she was caught using alcohol on two occasions in September 2013. The DHS worker, Nicki Enderle, testified that after being confronted with two positive drug screens for alcohol, the mother admitted she had not only used alcohol on those occasions, but throughout her enrollment in FWC. The mother's dishonesty during the CINA proceedings hurts her credibility. The trial court even made a specific finding that the mother was not a credible witness. As Enderle testified, "she has only gotten honest when she's been caught on issues and confronted with them."

The mother's dishonesty is not limited to her sobriety. The mother also hid her relationship with M.L. from the DHS and at the time of the termination, continued to claim M.L. had not lived with her, even though his name was on the lease, his belongings were in the apartment, and M.L. had told officers on the night of his arrest—as well as the court when facing criminal charges for domestic violence—that he lived with the mother. This was the fourth relationship involving domestic violence that the mother had been involved in since 2011. The last incident of domestic violence occurred just three months before the termination hearing, and the mother had not been involved in any domestic-violence counseling until after that incident occurred. There is no indication that the mother has internalized any benefit gained from this counseling.

The mother has not demonstrated she can provide for the children's immediate or future well-being. Enderle testified she did not believe the children could be safely returned to the mother's care at that time of the termination hearing because she had "continued with the same behaviors and lifestyle and placed the children in harm's way by allowing them to be around [M.L.], by continuing to abuse alcohol." Given the mother's past performance, her prognosis for the future is guarded. Delaying termination to allow the mother additional time to reunite with the children in hopes she will be successful in the face of her past is not in the children's best interests. "[O]ur legislature has carefully constructed a time frame to provide a balance between the parent's efforts and the child's long-term best interests." *In re D.W.*, 791 N.W.2d 703, 707 (Iowa 2010). Iowa Code section 232.116(1)(f) only requires the children be removed for twelve months before termination may be had. Here, the mother has been given two years to prove her commitment to her children and is not there yet. "The crucial days of childhood cannot be suspended while parents experiment with ways to face up to their own problems." *In re A.C.,* 415 N.W.2d 609, 613 (Iowa 1987).

The final step of our analysis requires that we consider whether any of the exceptions to termination provided in section 232.116(3) exist. The only one that could apply is found under paragraph c of that section: "There is clear and convincing evidence that the termination would be detrimental to the child at the time due to the closeness of the parent-child relationship." Iowa Code

§ 232.116(3)(c). Although the evidence in the record shows the children are bonded to the mother, we cannot find termination would be detrimental.

Although the grounds for terminating the father's parental rights had been proved, the court declined to terminate his rights because the children were being returned to the mother's care. *See* Iowa Code § 232.116(1)(a) (providing the court need not terminate the relationship between the parent and child if a relative has legal custody of the children). Because we terminate the mother's parental rights to the children, we likewise terminate the father's parental rights as well.

The grounds for terminating both the mother's and the father's parental rights have been proved by clear and convincing evidence and termination is in the children's best interests. Accordingly, we reverse the juvenile court order dismissing the petition to terminate parental rights and order the mother's parental rights be terminated pursuant to Iowa Code section 232.116(1)(f) and the father's parental rights be terminated pursuant to Iowa Code sections 232.116(1)(d), (f), and (*l*).

**REVERSED.**